IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LEANDRE LAYTON, et al.,          }
                                 }
        Plaintiffs,              }
                                 }        CIVIL ACTION NO.
v.                               }        08-AR-1542-S
                                 }
DHL EXPRESS (USA), INC.,         }
                                 }
        Defendant.               }
                                 }

## MEMORANDUM OPINION

Named plaintiff, Leandre Layton ("Layton"), and twenty-two (22) opt-in plaintiffs (collectively "plaintiffs") sue DHL Express (USA), Inc. ("DHL"), as allegedly similarly situated employees, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* (2006), for unpaid overtime wages as a joint employer. Originally, Layton named Sky Land Express, Inc. ("Sky Land"), and Gary Littlefield ("Littlefield"), Sky Land's principal shareholder and owner, as co-defendants with DHL.  After the court granted a joint motion to dismiss Sky Land and Littlefield with prejudice, the sole defendant is DHL.  Before the court are DHL's motion for summary judgment and Layton's motions to strike.  For the reasons that follow, all three motions will be denied.

### FACTS[1]

---

[1] Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Rule 56(c), F.R. Civ. P.  In accordance with Rule 56(c), the

**Parties:**

**DHL –** DHL, the sole defendant, is a delivery service business that provides shipping services worldwide through a global network of gateways, hub, warehouses, and terminals to meet its customers' needs. (Doc. 102 at 10; Doc. 107 at 3.)[2]  In some areas of the United States, DHL contracts with third parties to act as employers of the delivery/pick-up drivers who (i)wear DHL uniforms (the initial uniforms were supplied by DHL), and (ii) drive DHL logoed trucks. (Doc. 107 at 3.)

**Sky Land –** As relevant here, between 2005 and early 2009, DHL contracted with Sky Land to deliver and pick-up DHL packages throughout Alabama *Id.*  Plaintiffs were employed by and paid only by Sky Land to be delivery/pick-up couriers. (*Id.* at 5.)  Sky Land drivers worked out of three DHL warehouse locations in Alabama: Birmingham, Jasper, and Tuscaloosa. (*Id.*)

**Littlefield –** Littlefield, an original defendant, is the sole

---

narrative statement of facts includes facts that are undisputed by the parties.  Where there is a dispute, the facts are presented in the light most favorable to Layton.  "The movant 'bears the initial responsibility of informing the district court of the basis of its motion' by identifying those portions of the record that demonstrate the absence of genuine issues of material fact."  *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Thereafter, the burden shifts to the non-movant to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law.  *See* Rule 56(e), F.R. Civ. P.; *see also Celotex,* 477 U.S. at 324.  Conclusory allegations or legal conclusions are not enough.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[2]All citations to the record reference the document and page numbers as they appear on the court's electronic filing system.

shareholder and president of Sky Land. (Doc. 102 at 11.) Littlefield was responsible for negotiating the terms of Sky Land's contracts with DHL and oversaw Sky Land's daily operations. (*Id.*) Littlefield's business model consistently focused on one major client at a time. (*Id.*)

**Plaintiffs –** Plaintiffs were employed by Sky Land as delivery couriers whose principal duties consisted of delivering and picking up DHL packages. (*Id.*) Some plaintiffs also worked as supervisors, dispatchers, shuttle drivers, and floaters. (*Id.*) Plaintiffs spent much of their day in their delivery vehicles. (*Id.* at 12.)

**The Cartage Agreement:**

The business relationship was governed by a Cartage Agreement and its accompanying schedules. (*Id.* at 13.) Sky Land's lease of real and personal property from DHL was governed by their Administrative Agreement and Lease of Personal Property. (*Id.*) The Cartage Agreement was a one year agreement terminable at will by either party. (*Littlefield Depo.* 11:8-12:23.) It established the terms and conditions pursuant to which Sky Land would provide services to DHL. (*Id.*) Sky Land provided pick-up and delivery services in a specifically defined geographic territory. (*See id.,* 10:21-11:2.) Whenever necessary, Sky Land and DHL would and did renegotiate the terms of certain Schedules. (*Littlefield Depo.* 12:8-13.)

**Specific Terms –** The first paragraph of the Cartage Agreement

3

expressly states the intention to create an independent contractor relationship between DHL and Sky Land. (Doc. 102-3 ¶ 1.)  Paragraph 5 discusses the relationship between DHL and Sky Land in detail:

> 5. <u>Independent Contractor</u>.
> 5.1 <u>Independent Contractor Status</u>.  In making and performing this Agreement, the parties are acting, and shall act, as independent contractors. Neither party is, nor will be deemed to be, an agent, legal representative, joint venturer, franchisor, franchisee, or legal partner of the other party for any purpose.
>               . . .
> 5.2 <u>Status of Contractor's Employees</u>. Contractor shall be solely responsible for the interviewing, hiring, training, discipling, and termination of Contractor Workers and shall in all circumstances make clear to each Contractor Worker that such Contractor Worker is not an employee of DHL. It is recognized and and agreed by both parties that the Contractor Workers are not employees of DHL and are not entitled to participate in or receive any benefits or rights as employees of DHL, under any employee benefit and welfare plan, including, any employee insurance, pension, savings, or security plan.

(Doc. 102-3 ¶ 5-5.2.)

Additionally, the Cartage Agreement provided a non-exclusivity clause with express limitations, which allowed Sky Land to contract and conduct business with other companies:

> <u>Non-Exclusive Arrangement</u>. Nothing in this Agreement shall prevent Contractor from performing any cartage or related services for any other person or entity, nor prevent DHL from engaging any other person or entity to provide cartage or related services (whether in the Service Areas or otherwise); provided, however, that in no event shall Contractor (a) provide cartage or related services to DHL's direct competitors in regional or nationwide express transportation without DHL's prior written authorization or (b) provide such cartage or related services to a third party in a manner that in any way violates the Trademark Usage Guidelines (including, for example, by having Contractor Workers perform such cartage or related services while wearing a uniform with

a DHL Mark  or using a Contractor vehicle with a DHL Mark).

(Doc. 102-3 ¶ 3.14; *see also Littlefield Depo.* 13:4-10.)

Schedule D of the Cartage Agreement required that all Sky Land employees wear DHL authorized and logoed badges identifying the employee's name and "Employed by: Sky Land Express Inc., Independent Contractor for DHL Express." (Doc. 102-9 ¶6.2.)  The delivery vehicles driven by Sky Land employees also had the DHL logo and "Operated by Sky Land Express, Inc. Tuscaloosa, Alabama" on both the driver and passenger side doors. (Doc. 102-9 ¶ 4.2.) The vehicles used by Sky Land were to be furnished, operated, insured, and maintained solely at Sky Land's expense. (Doc. 102-3 ¶ 3.5-3.52.)

The manner and means by which Sky Land performed its services was expressly left to Sky Land's sole discretion and control, (Doc. 102-3 ¶ 3.3.) including staffing levels, provided that potential employees pass a background check and drug check. (Doc. 102-3 ¶ 3.4.1.)

**Compensation –** Sky Land's compensation negotiated under the Cartage Agreement provided for a payment per vehicle.  The extent of the per-vehicle compensation is disputed between the parties.  DHL contends that said compensation was never meant to cover the costs (i.e., cost of vehicle, vehicle insurance, fuel, maintenance, etc.) of the delivery vehicles, while plaintiffs contend it was meant to cover the entire cost arising from ownership of the vehicles. (Doc.

102 at 29; Doc. 107 at 8.)

Per the negotiation between DHL and Sky Land, DHL paid Sky Land an agreed upon amount each month. (*Talon Depo.* 77:5-12.)  This payment is "broken down into pieces such as cost per vehicle, cost per stop, cost per piece, rent, a bunch of other pieces, and all of that is then housed within the cartage administration group." (*Id.*)  The payment, which consists of stops, pieces, vehicles, and fixed, is referenced as "SPVF." (*Id.* at 78:6-8.)  SPVF is a portion of Sky Land's total compensation. (*Id.* at 78-85:9.)  The fixed cost items are the items that Sky Land pays each month that do not fluctuate, such as workers' compensation insurance, and vehicle insurance. (*Id.* at 98:1-10.)  The fixed costs are negotiated according to the weekly costs of operating the service. (*Id.*)

**Facilities and Supplies –** The Administrative Agreement between Sky Land and DHL governed the determination of the reasonable use of DHL's Birmingham facility.  The Agreement initially required Sky Land to pay a small monthly fee, but was shortly thereafter negotiated for use without a fee. (Doc. 107 at 5.)  The Jasper and Tuscaloosa locations were leased by Sky Land, and DHL reimbursed Sky Land each month for the cost of leasing these two facilities. (*Littlefield Depo.* 59:1-15.)  The outsides of the buildings at both facilities were posted with signs stating that they were "DHL" facilities. (Doc. 107 at 5.)  Sky Land employees parked in the warehouse areas reserved for "DHL employees." (*Id.*)

6

DHL provided all office supplies, including pens pads, sticky notes, letter express envelopes, express boxes, service labels, shipping forms, and shipping materials.  All of these supplies were emblazoned with the DHL logo. (*Littlefield Depo.* at 60-62:4.)  DHL provided Sky Land an initial allotment of DHL logoed uniforms at no cost, although any additional uniforms were purchased by Sky Land. (Doc. 102 at 30-31.)  Sky Land leased handheld scanning devices from DHL on a month-to-month basis. (Doc. 102 at 19-20.)

**Audits –** Pursuant to the Cartage Agreement, DHL would assist Sky Land in audits to ensure contractual compliance. (Doc. 102 at 32-34.)  Uniform audits were conducted to ensure that specifications were followed. (Doc. 102 at 32-33; Doc. 102-9 ¶ 5.2.)  Truck audits were also performed to make sure that the delivery trucks contained only the packages of DHL customers. (Doc. 102-17 ¶ 3.19.5.)

**Sky Land's Daily Operation:**

Each morning, DHL packages arrived at the Birmingham warehouse where they were coded and placed on the DHL conveyor belt. (Doc. 107 at 5.)  An on-site DHL employee would signal that all of the packages had been offloaded for the warehouse, coded, and put on the conveyor belt. (*Id.* at 5-6.)  Sorting of the packages could not begin until an on-site DHL employee had given the go-ahead. (*Id.*) The drivers then scanned each package bar code with the leased DHL handheld scanners. (*Id.* at 6.)  The drivers then  placed the packages on the appropriate truck, according to the delivery

address. (*Id.*)

Packages with Tuscaloosa or Jasper zip codes were loaded onto one of two trucks, dependent on destination, that then shuttled the packages to warehouses in the respective cities. (*Id.* at 6-7.) Once the packages arrived from DHL's Birmingham warehouse, drivers in Tuscaloosa and Jasper unloaded the packages and used the leased DHL handheld scanners to scan them. (*Id.* at 7.)  The packages were then loaded onto delivery vehicles assigned to particular routes based on zip codes. (*Id.*)  Drivers in all three locations were dependent on DHL's initiating the conveyor belt process in Birmingham before they could begin their work each day. (*Id.*) Before the drivers started their delivery routes, a DHL employee monitored compliance with the Cartage Agreement by observing the sorting and loading of packages. (*Id.*)  This on-site DHL employee would also assist Sky Land in performing uniform audits and performed truck audits each morning. (*Id.* at 8-9.)

Once the Sky Land drivers were out on delivery, DHL could communicate with the drivers via the leased DHL handheld scanners possessed by each driver.  These communications concerned customer complaints, inquiries, requests, or re-deliveries. (*Id.* at 9-10.) However, DHL contends that the majority of these issues were communicated to the Sky Land dispatcher or owner, and rarely directly to the Sky Land drivers. (Doc. 102 at 34-36.)  Plaintiffs contend that DHL regularly and directly commanded Sky Land drivers,

via text messages through the scanners or through phone calls to the drivers' cell phones, to rearrange their delivery schedules based on various factors. (Doc. 107 at 9-12.)  Drivers were also required to wait until the drop-box deadlines had passed, even if they were finished with their deliveries for the day, controlling when their work day would end. (*Id.* at 11.)

Once the drivers returned to their respective warehouses at the end of the day, DHL required them to unload their vehicles and place certain packages on the conveyor belt or give them to a DHL employee. (*Id.* at 12.)  Tuscaloosa and Jasper drivers transferred the packages from their vehicles to the shuttle trucks to be returned to the Birmingham warehouse. (*Id.*)  Before leaving for the day, the drivers placed their leased DHL handheld scanners in a DHL cradle to recharge overnight. (*Id.* at 12-13.)  The cradled DHL scanner would then communicate all the delivery and pick-up information from the day's activity to a DHL computer. (*Id.* at 13.)  The data received from the scanners generated daily performance reports for DHL review. (*Id.*)  DHL met with Sky Land management on a daily and weekly basis to discuss the drivers' performance based on the reports. (*Id.*)

### MOTIONS TO STRIKE

On November 14, 2010, Layton filed a motion to strike the declaration of Dean Pasino, attached as exhibit one to DHL's motion for summary judgment (Doc. 102-1.)  On December 1, 2010, Layton

filed another motion to strike the declaration of Bill Talon (Doc. 122-1.)  DHL responded on December 17, 2010.  The declarations are identical except for the first paragraph that disclosed the name and personal information of the declarant.

Layton's objections to both declarations are based upon DHL's alleged failure timely to disclose these witnesses.  Notably, Layton does not object to the content of the declarations, focusing instead upon DHL's alleged violation of Rule 26(e).  Bill Talon was disclosed and deposed as DHL's 30(b)(6) corporate representative.  Dean Pasino was not disclosed or deposed, but was knowledgeable on the relevant topics.  Because both declarations are corroborated by the deposition testimony of Talon, Sam Etheredge, and Gary Littlefield, plaintiffs have not been blind-sided, as they claim.  Therefore, **both motions will be DENIED.**

**ANALYSIS**

<u>**Joint Employment**</u>

The FLSA defines an "employer," as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. §203(d).  The courts have been clear that the definition of "employer" is to be viewed expansively.  The well developed principle of joint employment is present where a single individual stands in the relationship of an employee to two or more entities at the same time. *See Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208 (11th Cir. 2003). In the context of FLSA, the Code of Federal Regulations goes a step further,

10

establishing three circumstances in which a joint employment situation may arise:

> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the work week, a joint employment relationship generally will be considered to exist in situations such as:
>> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. §791.2(b). The courts have adopted varying tests and/or theories for analyzing whether a joint employment relationship exists. The Eleventh Circuit has termed the "economic realities" test as the most appropriate determination. *See Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994). The economic realities test lists eight factors to be considered:

> (1) Nature and degree of DHL control over Sky Land's drivers;
> (2) Degree of DHL's supervision, direct or indirect, of the Sky Land drivers' work;
> (3) DHL's right, directly or indirectly, to hire, fire, or modify Sky Land drivers' employment conditions;
> (4) DHL's power to determine Sky Land drivers' pay rates and methods of payment;
> (5) DHL's preparation of payroll and payment of Sky Land drivers' wages;
> (6) DHL's ownership of the facility where Sky Land drivers performed their work;

11

    (7) Sky Land drivers' performance of a line-job integral
    to DHL's business; and
    (8) DHL and Sky Land's relative investment in equipment
    and facilities.

See *Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996)
(*citing Aimable v. Long & Scott Farms, Inc.*, 20 F.3d 434, 440-46
(11th Cir. 1994)).  No single factor is determinative because the
weight of each factor is dependent on the putative employee's
economic dependence upon the alleged employer. *Antenor*, 88 F.3d at
932-33.  "Congress expressly rejected the common-law definition of
employment, which is based on limiting concepts of control and
supervision." *Id.* at 929 (citing *Walling v. Portland Terminal Co.*,
330 U.S. 148, 150-51 (1947)).  Because the FLSA is a remedial
statute, the court must construe it broadly. *Antenor*, 88 F.3d at
932-33.

    If DHL is an employer, its good faith does not excuse it from
its obligation to pay what is due under FLSA.  "Nor does it matter
that the parties had no intention of creating an employment
relationship, for application of the FLSA does not turn on
subjective intent." *Brennan v. Partida*, 492 F.2d 707, 709 (5th Cir.
1974) (citing *Rutherford Food Corp. V. McComb*, 331 U.S.722, 728-29
(1947)).  It is sufficient that one person "suffer or permit
[another] to work." 29 U.S.C. §203(g); *Rutherford*, 331 U.S. at 728-
29.

**(1) Nature and Degree of Control**

12

The first factor of joint employer status is the nature and degree of DHL's control over the Sky Land drivers. The Eleventh Circuit has held that "[s]uch control arises when [the alleged employer] determines for example, the number of employees hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks, and whether a worker should be disciplined or retained." *Id.* at 933.

Plaintiffs contend that DHL did, in fact, control plaintiffs' work schedules. (Doc. 107 at 42.)  According to plaintiffs, DHL controlled the start time by determining when the packages arrived each morning at the warehouse. (*Id.*)  DHL controlled the stop times by requiring them to "stay in their trucks until the deadline for pick-ups from DHL's drop-boxes had passed." (*Id.*)  Similarly, plaintiffs contend that DHL required them to deliver packages by certain times.

While it is true that Littlefield/Sky Land determined what time the employees reported for work each day (*see Littlefield Depo.* 24:4-14), and Sky Land issued their pay checks, the employees could not begin their delivery routes without the packages delivered by DHL to the Birmingham warehouse.  The Cartage Agreement could not be satisfied if plaintiffs did not wait until the drop box deadline had passed each day before stopping. Thus, arguably, DHL does have a degree of control over the start and stop times for the employees.

**(2) Direct/Indirect Degree of Supervision**

The second factor overlaps with the first and was "developed in large part to assign responsibility to businesses which did *not* directly supervise the activities of the putative employees." *Antenor*, 88 F.3d at 934. "[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision" necessary to support a joint employment relationship. *See Martinez-Mendoza*, 340 F. 3d at 1211.

Plaintiffs contend that "DHL managers directly supervised–and regularly criticized–how plaintiffs (and other drivers) loaded their trucks," wore their uniforms, supervised the morning sort, conducted daily truck audits, and communicated directly with drivers regarding re-deliveries and pick-ups. (Doc. 107 at 42-43.) DHL contends that there was no supervision of the morning sort, but rather that "DHL personnel were generally present" and that "[t]he undisputed testimony confirms that DHL 'observed' the morning sort." (Doc. 122 at 31-32.)  In brief, DHL adamantly contends that the truck audits "were designed to <u>monitor Sky Land's compliance</u> with the Cartage Agreement." (Doc. 122 at 33.) (emphasis in original).  The Uniform audits were also intended only to monitor compliance with the Cartage Agreement. (*Id.*)  Notably, DHL never had any input regarding how compliance issues were to be addressed or ultimately resolved. (*See Littlefield Depo.* 37:22-38:5; 38:22-39:11; 28:5-29:4.)

14

Whether the definitions of "supervise," "observe," and "monitor" are similar, the facts present a reasonable question for the jury to determine if DHL's regular presence constitutes direct or indirect supervision relevant to a finding of the existence or non-existence of a joint employment relationship.

**(3) Right to Hire, Fire, or Modify Employment Conditions**

In addition to hiring and firing, the courts have evaluated a putative joint employer's ability to: (1) veto hiring decisions; (2) dictate working hours; (3) dictate work conditions by having workers start and stop throughout the day; and (4) reassign workers' tasks. *See generally Aimable*, 20 F.3d at 442; *Antenor*, 88 F.3d at 935. Notably, even where "a major client can pressure an employer into firing a particular individual," such power "does not transmute that client into that individual's employer." *Morrison v. Magic Carpet Aviation*, F.3d 1253, 1255 (11th Cir. 2004).

The Cartage Agreement expressly gives Sky Land control over the hiring, firing, or modification of their employees' working conditions. Plaintiffs contend that DHL's control over plaintiffs' hours (requiring plaintiffs to work past the drop box deadlines) is modification of employment conditions sufficient to confer joint employment status on DHL. (Doc. 107 at 43.) DHL contends that any imposed employee requirements, e.g. drug/alcohol screenings and background checks, are checks on "quality control," not actual authority over hiring. (Doc. 122 at 37.) While testimony reflects

15

that Sky Land had complete authority over the hiring, firing, payment, and disciplining of its employees, (*Littlefield Depo.* at 28:22-29:11), the court does not find that this factor proves joint employment as a matter of law.

**(4) Pay Rates and Methods of Payment**

Both DHL and plaintiffs acknowledge that DHL had no input in determining plaintiffs' pay rates and methods of pay. (Doc. 122 at 35; Doc. 107 at 43.)  Therefore, this factor does not favor a finding of joint employment.

**(5) Preparation of Payroll and Payment of Wages**

Again, both parties acknowledge that there is no evidence that DHL is responsible for preparing the payroll or paying plaintiffs' wages. (Doc. 122 at 38; Doc. 107 at 44.)  Therefore, this factor does not favor a finding of joint employment.

**(6) Ownership of Work Facilities**

This factor is "probative of joint employment because without land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Martinez-Mendoza*, 340 F.3d at 1214; *see also Antenor*, 88 F.3d at 937.  The Eleventh Circuit, in *Morrison v. Magic Carpet Aviation*, applied the FLSA multi-factor test to a Family Medical Leave Act case to evaluate a joint employment relationship between one of the defendants and the

16

plaintiff-pilot. 383 F.3d 1253 (11th Cir. 2004).  The court determined that the plaintiff-pilot's work premises was the Boeing airplane he flew. *Id.* at 1255.  Consequently the contractor-defendant, based on the "work premises" factor, was considered the plaintiff's joint employer because the contractor-defendant had to pay the costs of the plane's operation. *Id.* at 1255.

DHL leased the Birmingham facility to Sky Land.  It was where some plaintiffs began and ended their day, although Sky Land only paid for the use of the Birmingham facility for a limited period of time.  However, plaintiffs and DHL both agree that the overwhelming majority of plaintiffs' time was spent in their delivery vehicles. (Doc. 102 at 72; Doc. 107 at 34; Doc. 122 at 46.)

The Sky Land delivery vehicles displayed the DHL logo, while also stating "Operated by Sky Land Express, Inc., Tuscaloosa, Alabama." (Doc. 102 at 30.)  Further, the vehicles were owned by Sky Land. (*Littlefield Depo.* 33:2-12.)  DHL contributed to the costs associated with the vehicles' daily operations and maintenance. (Doc. 107 at 34-35.)

Though Sky Land officially owned the vehicles, DHL's contributions to the costs associated with them makes this factor ambiguous.

**(7) Performance of a Specialty Job Integral to the Business**

An employee who performs a task, routine or not, that is integral to the putative employer's business is likely to depend on

17

the defendant's overall enterprise and thus, may be probative of joint employment. *See Martinez-Mendoza*, F.3d at 1213.  Looking beyond the formalities of who paid and supervised the workers, the court in *Fahs v. Tree-Gold Co-op. Growers of Florida, Inc.*, emphasized that the labor contractors and crewmembers' services "constituted a part of an integrated economic unit" controlled by the packinghouse operator (the putative employer). 166 F.2d 40, 44-45 (5th Cir. 1948).  The premises and all significant investment in tools and facilities were provided by the packinghouse and, although it did not directly control the workers, the packinghouse asserted control whenever its interests were involved. Accordingly, the court found that the crew workers and contractors were sufficiently dependent on the packinghouse to be considered employees. *Id.* at 44-45.

DHL contends that plaintiffs were not integral to DHL's overall business because DHL contracted with two other companies in the area for similar services. (Doc. 102 at 74; Doc. 122 at 47.) Plaintiffs view this indicator differently, claiming that their job of delivering and picking up packages was a part of a series of interdependent steps crucial to DHL's overall business. (Doc. 107 at 35.)  Whether this factor should be viewed in a literal fashion beneficial to the plaintiffs, or in a "big picture" fashion beneficial to DHL, the court is unsure.  It is certain that this indicator can be viewed in two ways.

18

**(8) Investment in Equipment and Facilities**

The court must consider "the relative degree of investment in equipment and facilities by the independent contractor on one hand, and the putative employer on the other." *Antenor*, 88 F.3d at 937.

In the present case, both parties have made significant investment in equipment and facilities. Sky Land made a monthly payment to DHL, which provided for Sky Land's regular operating expenses. (Doc. 102 at 76; Doc. 107 at 34.) DHL supplied the Birmingham facility to Sky Land, as well as items such as the handheld scanner, the initial DHL uniforms, and the drop-box supplies. (Doc. 122 at 40-41.) However, Sky Land invested in the delivery vehicles, the insurance associated with the vehicles, additional DHL uniforms needed after the initial allotment, and other monthly operating expenses. (Doc. 102-3.) Because there were significant investments by both parties, the facts present a reasonable question for the jury regarding whether DHL's investment is sufficient to favor a finding of joint employment.

**(9) Other Indicators**

The Eleventh Circuit relies on the eight factors discussed above, but there are other indicators that have been used from time to time. These additional factors have carried little weight in the Eleventh Circuit, but it has not held them inadmissible evidence.

**Permanence of the Relationship**

19

The relationship between DHL and Sky Land was never intended to be exclusive or permanent, as evidenced by the express provision of non-exclusivity in the Cartage Agreement. (Doc. 102-3; *Littlefield Depo.* 13:4-10.)  Plaintiffs contend that because Sky Land did not work for any other client and terminated their employees when DHL terminated their Agreement, permanence and exclusivity is present and favors a finding of joint employment. (Doc. 107 at 45.)  Notably, Sky Land had the option to work with other clients but "had enough business to do with DHL that [Sky Land] didn't want to expand to other areas." (*Littlefield Depo.* 63:6-17.)  Thus, just because Sky Land did not exercise its option to have other relationships does not prove a permanent or exclusive relationship with DHL.

**Degree of Skill Required**

The Eleventh Circuit has stated that "this factor is not relevant as it shows appellants were employees, **but not of whom.**" (emphasis added) *Aimable*, 20 F.3d at 444.  However, this theory has been considered a part of the joint employer analysis where: "the lower the worker's skill level, the lower the value and marketability of his services." *Martinez-Mendoza*, 340 F.3d at 1212.

Whether plaintiffs have marketable skills in the courier or delivery field is an arguable point.  Plaintiffs contend that the most challenging aspect of their job was using the handheld scanner, which was so easy "a 12-year old child could operate."

20

(Doc. 107 at 45; *see also Littlefield Depo.*)  DHL on the other hand, asserts that much skill is required in order to be a successful delivery courier. (Doc. 122 at 45.)

The court is not prepared to decide, without a jury, whether a person's job requires skill, as there are certainly people who would not be successful delivery couriers.  This factor is one that a jury is more equipped to handle.

### CONCLUSION

Because the factors measuring joint employment fall closely on both sides, plaintiffs' motions to strike and DHL's motion for summary judgment will be denied.  A separate order will be entered effectuating this opinion.


DONE this 12th day of January, 2011.




WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE