```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
                  SOUTHERN DIVISION

LEANDRE LAYTON, et al.,      }
                             }
     Plaintiffs,             }
                             }      CIVIL ACTION NO.
v.                           }      08-AR-1542-S
                             }
DHL EXPRESS (USA), INC.,     }
                             }
     Defendant.              }
                             }
```

**MEMORANDUM OPINION**

Named plaintiff, Leandre Layton ("Layton"), and twenty-two (22) opt-in plaintiffs (collectively "plaintiffs"), as allegedly similarly situated employees, sue DHL Express (USA), Inc. ("DHL"), pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* (2006), for unpaid overtime wages. Layton named Sky Land Express, Inc. ("Sky Land"), and Gary Littlefield ("Littlefield"), Sky Land's principal shareholder and owner, as joint employers with DHL. Skyland and Littlefield filed a motion for summary judgment, after which a joint motion to dismiss the action as against Sky Land and Littlefield with prejudice was filed and granted. The rationale for this dismissal was not shared with the court, who was not looking a gift horse in the mouth. This left DHL as sole defendant. Plaintiffs never amended their complaint to remove the allegation that DHL was a joint employer with Skyland and Littlefield. In other words, the allegation that DHL was a

1

"joint employer", was a central allegation, and still in the complaint.

DHL filed an unopposed motion to adopt Sky Land's and Littlefield's motion for summary judgment, which is now under submission. For the reasons that follow, the motion will be granted.

## FACTS[1]

DHL, now the sole defendant, is a delivery service business that provides shipping services worldwide through a global network of gateways, hubs, warehouses, and terminals to meet its customers' needs. (Doc. 102 at 10; Doc. 107 at 3.)[2] In some areas of the United States, including the Northern District of Alabama, DHL contracts with third parties to employ the delivery/pick-up drivers who (I) wear DHL uniforms (the initial uniforms were supplied by DHL), and (ii) to drive DHL logoed trucks. (Doc. 107 at 3.)

---

[1] Summary judgment must be granted if "there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a), F.R. Civ. P. In accordance with Rule 56(a), the narrative statement of facts includes facts that are undisputed by the parties. Where there is a dispute, the facts are presented in the light most favorable to Layton. "The movant 'bears the initial responsibility of informing the district court of the basis of its motion' by identifying those portions of the record that demonstrate the absence of genuine issues of material fact." *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Thereafter, the burden shifts to the non-movant to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law. *See* Rule 56(c), F.R. Civ. P.; *see also Celotex,* 477 U.S. at 324. Conclusory allegations or legal conclusions are not enough. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[2] All citations to the record reference the document and page numbers as they appear on the court's electronic filing system.

As relevant here, between 2005 and early 2009, DHL contracted with former defendant, Sky Land, to deliver and pick-up DHL packages throughout Alabama. (*Id.*) Plaintiffs, delivery/pick-up couriers, were employed by and paid only by Sky Land. (*Id.* at 5.) Sky Land drivers worked out of three DHL warehouse locations in Alabama: Birmingham, Jasper, and Tuscaloosa. (*Id.*)

Littlefield, an original defendant, is the sole shareholder and president of Sky Land. (Doc. 102 at 11.) Littlefield was responsible for negotiating the terms of Sky Land's contracts with DHL and for overseeing Sky Land's daily operations. (*Id.*) Littlefield's business model consistently focused on one major client at a time, in this instance, DHL. (*Id.*)

Plaintiffs were undisputably employed by Sky Land as delivery couriers. Their principal duties consisted of delivering and picking up DHL packages. (*Id.*) Some plaintiffs also worked as supervisors, dispatchers, shuttle drivers, and floaters. (*Id.*) All employees were required to know how to operate all types of delivery vehicles, should the need arise. (*Id.*) Plaintiffs spent much of their day in their delivery vehicles. (*Id.* at 12.)

The business relationship between DHL and Sky Land was governed by a Cartage Agreement and its accompanying schedules. (*Id.* at 13.) Sky Land's lease of real and personal property from DHL was governed by an Administrative Agreement and Lease of Personal Property. (*Id.*) The Cartage Agreement was a one year

3

agreement terminable at will by either party. (*Littlefield Depo.* 11:8-12:23.) It established the terms and conditions pursuant to which Sky Land would provide services to DHL. (*Id.*) Sky Land provided pick-up and delivery services in a specifically defined geographic territory. (*See id.*, 10:21-11:2.) Whenever necessary, Sky Land and DHL renegotiated the terms of certain Schedules. (*Littlefield Depo.*)

Schedule D of the Cartage Agreement required that all Sky Land employees wear DHL authorized and logoed badges identifying the employee's name and the words "Employed by: Sky Land Express Inc., Independent Contractor for DHL Express." (Doc. 102-9 ¶6.2.) The delivery vehicles driven by Sky Land employees also displayed the DHL logo and "Operated by Sky Land Express, Inc. Tuscaloosa, Alabama" was emblazoned on both the driver and passenger side doors. (Doc. 102-9 ¶ 4.2.) The vehicles used by Sky Land were to be furnished, operated, insured, and maintained solely at Sky Land's expense. (Doc. 102-3 ¶ 3.5-3.52.)

The manner and means by which Sky Land performed its services for DHL was expressly left to Sky Land's sole discretion and control, (Doc. 102-3 ¶ 3.3) including staffing levels, except that potential employees must pass a background check and drug test check. (Doc. 102-3 ¶ 3.4.1).

The Administrative Agreement between Sky Land and DHL governed what constituted the reasonable use of DHL's Birmingham facility.

4

The Agreement initially required Sky Land to pay a small monthly fee, but was shortly thereafter amended to provide for use without a fee. (Doc. 107 at 5.) The Jasper and Tuscaloosa locations were leased by Sky Land from third parties, and DHL reimbursed Sky Land each month for the cost of leasing these two facilities. (*Littlefield Depo.* 59:1-15.) The exteriors of the buildings at both facilities were posted with signs stating that they were "DHL" facilities. (Doc. 107 at 5.) Sky Land employees parked in the warehouse areas reserved for "DHL employees." (*Id.*)

DHL provided office supplies, including pens, pads, sticky notes, letter express envelopes, express boxes, service labels, shipping forms, and shipping materials. All of these supplies contained the DHL logo. (*Littlefield Depo.* at 60-62:4.) DHL provided Sky Land an initial allotment of DHL logoed uniforms at no cost, although all additional uniforms were purchased by Sky Land. (Doc. 102 at 30-31.) Sky Land leased handheld scanning devices from DHL on a month-to-month basis. (Doc. 102 at 19-20.)

Pursuant to the Cartage Agreement, DHL assisted Sky Land in audits to ensure contractual compliance. (Doc. 102 at 32-34.) Uniform audits were conducted to ensure that specifications were followed. (Doc. 102 at 32-33; Doc. 102-9 ¶ 5.2.) Truck audits were performed to make sure that the delivery trucks contained only the packages of DHL customers. (Doc. 102-17 ¶ 3.19.5.)

Each morning, DHL packages from all over the country arrived

at the Birmingham warehouse where they were coded and placed on the DHL conveyor belt. (Doc. 107 at 5.) An on-site DHL employee would signal that all of the packages had been offloaded for the warehouse, coded, and put on the conveyor belt. (*Id.* at 5-6.) Sorting of the packages could not begin until an on-site DHL employee had given the go-ahead. (*Id.*) The drivers then scanned each package bar code with the leased DHL handheld scanners. (*Id.* at 6.) The drivers then placed the packages on the appropriate truck, according to the delivery address. (*Id.*)

Packages with Tuscaloosa or Jasper zip codes were loaded onto one of two trucks, dependent on destination, that then shuttled the packages to warehouses in the respective cities. (*Id.* at 6-7.) Once the packages arrived from DHL's Birmingham warehouse, drivers in Tuscaloosa and Jasper unloaded the packages and used the leased DHL handheld scanners to scan them. (*Id.* at 7.) The packages were then loaded onto delivery vehicles assigned to particular routes based on zip codes. (*Id.*) Drivers in all three locations were dependent on DHL's initiation of the conveyor belt process in Birmingham before they could begin their work each day. (*Id.*) Before the drivers started their delivery routes, a DHL employee monitored compliance with the Cartage Agreement by observing the sorting and loading of packages. (*Id.*) This on-site DHL employee, not an opt-in plaintiff, also assisted Sky Land in performing uniform audits and performed truck audits each morning. (*Id.* at 8-9.)

Once the Sky Land drivers were out on delivery, DHL could communicate with the drivers via the leased DHL handheld scanners possessed by each driver. These communications concerned customer complaints, inquiries, requests, or re-deliveries. (*Id.* at 9-10.) However, DHL contends that the majority of these issues were communicated to the Sky Land dispatcher or owner, and rarely directly to Sky Land drivers. (Doc. 102 at 34-36.) Plaintiffs contend that DHL regularly and directly commanded Sky Land drivers, via text messages through the scanners or through phone calls to the drivers' cell phones, to rearrange their delivery schedules based on various factors. (Doc. 107 at 9-12.) Drivers were also required to remain at work until the drop-box deadlines had passed, even if they were finished with their deliveries for the day, controlling when drivers' work days ended. (*Id.* at 11.)

Once the drivers returned to their respective warehouses at the end of the day, DHL required Sky Land to have them unload their vehicles and place certain packages on the conveyor belt or give them to a DHL employee. (*Id.* at 12.) Tuscaloosa and Jasper drivers transferred the packages from their vehicles to shuttle trucks to be returned to the Birmingham warehouse. (*Id.*) Before leaving for the day, the drivers placed their leased DHL handheld scanners in a DHL cradle to recharge overnight. (*Id.* at 12-13.) The cradled DHL scanner would then communicate all the delivery and pick-up information from the day's activity to a DHL computer. (*Id.* at 13.)

The data received from the scanners generated daily performance reports for DHL review. (*Id.*) DHL met with Sky Land management on a daily and weekly basis to discuss the drivers' performance based on the reports. (*Id.*)

## ANALYSIS

The court has dealt with the question of joint employment status in an earlier opinion. (Doc. 135) The court may not have fully expressed its agreement with plaintiffs that if DHL was an employer, it was a joint employer with Sky Land, which arguably was the sole employer. The two questions remaining are 1) whether plaintiffs' dismissal of Sky Land effectively eliminated their claim against DHL, and 2) if not, whether the Motor Carrier Act ("MCA") exemption applies to the plaintiffs *vis-a-vis* DHL.

At page 10 of their brief (Doc. 167), plaintiffs' "factual statements" state:

> "DHL is, at this point, plaintiffs' putative joint employer pursuant to 29 C.F.R. § 791.2."

(Doc. 167) Plaintiffs have never amended their complaint to charge that DHL is their sole employer. The allegation of a joint employer is still a material element of the complaint. Plaintiffs simply giving up on Sky Land, the company that wrote their pay checks, cannot cause Sky Land simply to disappear into thin air without any proof that it was, in fact, a joint employer with DHL and that DHL was a joint employer with Sky Land. Plaintiffs no longer mention Sky Land, except in passing. They avoid Sky Land like the plague.

8

Plaintiffs' case against Sky Land, a "putative joint-employer", was, in this court's opinion, better than their case against DHL, which never wrote any of their checks. This would strongly suggest that when Sky Land's motion for summary judgment was about to be granted, plaintiffs dismissed Sky Land, their obvious employer, while continuing to pursue DHL, which then wisely adopted Sky Land's motion for summary judgment. Plaintiffs' failure to support their allegation of "joint" employment calls for summary judgment.

If the court is incorrect on the above-described fatal shortcoming, there is yet another fatal shortcoming. The FLSA requires employers to pay employees at an overtime rate if they work more than forty (40) hours during the workweek. 29 U.S.C. §207(a)(1). It also provides a number of exemptions to the overtime provision. *See* 29 U.S.C. §213(b)(1)-(30). The Eleventh Circuit construes the FLSA narrowly against the employer. *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009). The FLSA exempts from the overtime pay requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." This provision is known as the Motor Carrier Act exemption. 29 U.S.C. §213(b)(1). Its application depends on "whether the Secretary has the power to regulate, not whether the Secretary has actually exercised such power." *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181

n.2 (11th Cir. 1991). For the MCA exemption to apply, the Secretary of Transportation's "power to regulate under the act merely needs to cover a particular group of employees." *Abel v. Southern Shuttle Serv., Inc.*, 631 F.3d 1210, 1213 (11th Cir. 2011) citing *Walters*, 575 F.3d at 1226.

Section 31502 of Title 49 explicitly states that this provision in §31502(b) applies to transportation "described in sections 13501 and 13502 of this title." 49 U.S.C. §31502(a)(1). Accordingly, §13501 of Title 49 confers jurisdiction on the Secretary of Transportation over transportation by a motor carrier "between a place in . . . a State and a place in another State" or "a State and another place in the same State through another State." 49 U.S.C. §13501(1)-(2). Plaintiffs have made no persuasive attempt to distinguish Sky Land from DHL as far as this statute is concerned. If it applied to Sky Land (conceded?), it applies to DHL.

The *Walters* court elaborated the MCA exemption in some detail. *Walters*, 575 F.3d at 1226-27. The MCA confers upon the Secretary of Transportation the authority "to regulate the maximum hours of service of employees who are employed (1) by a common carrier by motor vehicle; (2) engaged in interstate commerce; and (3) whose activities directly affect the safety of operations of such motor vehicles." *Abel*, 631 F.3d at 1213, citing *Walters*, 575 F.3d at 1226. Its applicability is dependent on the class to which the

employer belongs and the class of work involved in the employee's job. *Id.* at 1227; *see also* 29 C.F.R. §782.2 (outlining the requirements for the MCA exemption). The *Walters* court further determined that there are two requirements for an employee to be subject to the motor carrier exemption: (1) "his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA;" and (2) "the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]." *Id.*

As discussed *supra*, in order to be subject to the jurisdiction of the Secretary of Transportation, DHL must be a motor carrier or private motor carrier. *See Abel*, 631 F.3d at 1213. Title 49, section 13102(15) defines a "motor private carrier" as:

> a person, other than a motor carrier, transporting property by motor vehicle when—
>   (A) the transportation is as provided in section 13501 of this title [49 U.S.C. §13501];
>   (B) the person is the owner, lessee, or bailee of the property being transported; and
>   (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

*See* 49 U.S.C. §13102(15).

Here, DHL is clearly a motor private carrier. The first prong under 49 U.S.C. §13501, requires interstate commerce. It is undisputed that DHL employed Sky Land for pick-up/delivery services

11

of freight/packages in the geographic area of Birmingham, Jasper, and Tuscaloosa, Alabama. The freight/packages traveled throughout the country before arriving at the Birmingham facility for shipment by the Sky Land employees. Although plaintiffs' travel routes did not cross state lines, they nonetheless meet the *de minimus* interstate commerce requirement because they transported freight "in interstate commerce, either as part of continuous interstate movements or of interstate movements begun or terminated" in Alabama. *Morris v. McComb*, 332 U.S. 422. 427 & 432-22 (1947); *see generally Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (involving a wholesale distributor of paper products made outside the state but transported only to customers within the state); *Baez*, 938 F.2d 180, 181-82 (11th Cir. 1991) (involving armored trucks delivering to Florida banks checks and other instruments bound for banks outside of Florida); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969) (dealing with the oil company's transport within Georgia of petroleum products originating from refineries in Texas and Mississippi). Because Sky Land's intrastate transportation of freight/packages was in the "practical continuity" of interstate commerce, DHL meets the first prong.

As to the second and third prongs of the motor private carrier test, DHL meets the definition of a "bailee". Based on the contractual relationship with Sky Land, DHL transferred possession

but not ownership of freight/packages to Sky Land for the limited purpose of transport/pick-up/delivery of such packages to and from recipients. Further, the freight/packages were being transported to further DHL's commercial enterprise. The undisputed facts clearly demonstrate that at all times relevant to this action, DHL was a motor private carrier subject to the jurisdiction of the Secretary of Transportation. The *Walters* court stated that "'it will ordinarily be assumed that the interstate commerce requirements of section 13(b)(1) exemption are satisfied' when the employee's intrastate transportation 'is part of an interstate movement of goods or persons being thus transported so as to constitute interstate commerce within the meaning of the Fair Labor Standards Act.'" *Walters*, 575 F.3d at 1231, citing 29 C.F.R. §782.7(b)(1).

The second requirement of the MCA exemption test is whether the Secretary's jurisdiction extends to plaintiffs' work-related activities at Sky Land. To meet this requirement, DHL must show that plaintiffs "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in the interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. §782.2(a). Plaintiffs do not and cannot dispute that, as drivers, they engaged in activities that directly affected the safety of operation of motor vehicles in the transportation of passengers on public highways.

Here, all plaintiffs, even those in supervisory positions, were required as needed, to be able to operate any vehicle, including "box trucks" which weigh between 10,000 pounds and 16,000 pounds. (*See Littlefield Depo.* 183:14 - 184:14). Although plaintiffs' driving duties never took them across state lines, the freight/packages carried were in the uninterrupted flow of interstate commerce, meeting the second requirement under the MCA. Plaintiffs' clumsy attempt to make the weight of the trucks a stipulated fact is rejected. There is no admissible evidence offered by plaintiffs to prove their wishful thinking on this subject.

The MCA, as it existed prior to August 10, 2005, contained the two part test outlined above. The MCA at that time, gave the Department of Transportation authority, regardless of the weight of the vehicles. This exemption from overtime pay prior to August 10, 2005, clearly applied to the class of drivers who are plaintiffs in this action. On August 10, 2005, a new law, called the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), was passed making a definitional change. The change replaced "motor vehicle" with "commercial motor vehicle," altering which vehicles were within the Secretary of Transportation's jurisdiction. This change effectively limited the Secretary's jurisdiction to vehicles with gross weights of 10,001 pounds or more. The result was that many workers engaged in

transportation using smaller vehicles such as delivery vans, were no longer exempt. The two part test for applying the MCA exemption did not change, however.

In the present case, all plaintiffs functioned in one of three roles: route driver, shuttle driver, or supervisor. All three roles required the driving of delivery vehicles, including the ability to operate the "box trucks." While the standard vehicle in the Sky Land fleet was a delivery van weighing less than 10,000 pounds, Sky Land generally used the larger box trucks to shuttle freight/packages between Birmingham, Tuscaloosa, and Jasper. Plaintiffs Kevin Barkley (*Barkley Depo*. at 125:6, 134:1 - 23, 148:14 - 150:21), Benjamin Haviland (*Haviland Depo*. at 9:3 - 13), Christopher Rosser (*Rosser Depo*. at 11:1 - 17, 58:18 - 59:1), and Andre Weathers (*Weathers Depo*. at 24:1 - 20) testified that they regularly operated the box trucks, while the remaining class members were required to operate them as needed.

It is not necessary for the plaintiffs to drive the requisite vehicle every day, or even most days, to be covered by the MCA exemption, only that driving such vehicle was not a trivial or insignificant portion of plaintiffs' duties. For purposes of the MCA, 29 C.F.R. §782.3(a) states that a driver includes:

> Individuals whose driving duties are concerned with transportation some of which is in intrastate commerce and some of which is in interstate or foreign commerce within the meaning of the Motor Carrier Act; individuals who ride on motor vehicles engaged in transportation in interstate or foreign commerce and act as assistant or

15

>   relief drivers of the vehicles in addition to helping
>   with loading, unloading, and similar work.

29 C.F.R. §782.3(a). Based on the foregoing, all the plaintiffs are exempt from the FLSA overtime requirements prior to and subsequent to the August 10, 2005 definitional change to the MCA. As a result, the remaining arguments will be moot and do not require the court's attention.

## CONCLUSION

DHL is not shown to be an employer, much less a "joint employer". Because plaintiffs have not offered evidence disputing any material fact that would avoid the Motor Carrier Act exemption, which also applied to plaintiffs *vis-a-vis* Sky Land, and because plaintiffs have ignored their obligation to offer proof of joint employment, DHL's adopted motion for summary judgment will be granted. A separate order will be entered effectuating this opinion.


DONE this 3rd day of May, 2011.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

16